*Execution Version*

# SECURITY AGREEMENT

This Security Agreement (this "<u>Security Agreement</u>"), effective as of December 22, 2021, is made and entered into by and between SOURCEWATER, INC., a Delaware corporation d/b/a Sourcenergy ("<u>Debtor</u>"), and Energy Debt Holdings LLC, a Texas limited liability company ("<u>Secured Party</u>"), and delivered pursuant to that certain Senior Secured Credit Note (the "<u>Note</u>"), dated of even date herewith, made by the Debtor in favor of the Secured Party in the original principal amount of up to FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($500,000.00).

## RECITALS

WHEREAS, to induce the Secured Party to enter into the Note, the Debtor has agreed to enter into this Security Agreement to secure the Debtor's obligations arising under the Note by granting to the Secured Party a security interest in the Debtor's property on the terms and conditions set forth below;

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein set forth, and in order to induce the Secured Party to enter into the Note and perform its obligations thereunder, the Debtor hereby acknowledges and agrees that it will receive material benefit from the Note and agrees with the Secured Party as follows:

**Section 1.  <u>Definitions</u>**.  The term "<u>State</u>", as used herein, means the State of Texas.  All terms defined in the Uniform Commercial Code of the State and used herein shall have the same definitions as specified therein.  However, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9.  The term "<u>Obligations</u>", as used herein, means all of the indebtedness, obligations and liabilities of the Debtor to the Secured Party, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising under the Note and this Security Agreement (the "<u>Loan Documents</u>").

**Section 2.  <u>Grant of Security Interest</u>**.  The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Obligations, a security interest in, and so pledges and assigns to the Secured Party, the following properties, assets and rights, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "<u>Collateral</u>"): all personal property of the Debtor of every kind and nature, whether tangible or intangible, including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles (including all intellectual property and payment intangibles).

**Section 3.  <u>Representations and Warranties; Covenants</u>**.  The Debtor hereby warrants and covenants as follows:

(a)     The Debtor will promptly furnish the Secured Party such information concerning the Debtor, the Collateral, and any of the Debtor's account debtors as the Secured Party may at any time reasonably request.

(b) The Debtor will permit the Secured Party and its representatives at any reasonable time to inspect any and all inventory forming part of the Collateral, and to inspect, audit and make copies of and extracts from all records and all other papers in possession of the Debtor pertaining to the Collateral and the Debtor's account debtors, and will promptly, on request of the Secured Party, deliver to the Secured Party all such records and papers. The Secured Party shall treat all such records and information pertaining to the Collateral provided to it hereunder as confidential information, and hereby agrees not to disclose to any third party any such records or information pertaining to the Collateral.

**Section 4. Disposition of Collateral in Ordinary Course**. Nothing herein shall prevent the Debtor from selling, trading in, or replacing any of the Collateral in the ordinary course of its business.

**Section 5. Secured Party May Perform**. Secured Party, at its option, and after ten (10) days' written notice to Debtor, but without any obligation whatsoever to do so, may (i) discharge taxes, claims, charges, liens, security interests, assessments or other encumbrances of any and every nature whatsoever at any time levied, placed upon or asserted against the Collateral to the extent then past due, (ii) place and pay for insurance on the Collateral, including insurance that only protects Secured Party's interest, (iii) during the continuance of an Event of Default pay for the repair, improvement, testing, maintenance and preservation of the Collateral, (iv) pay any filing, recording, registration, licensing or certification fees or other fees and charges related to the Collateral, or (v) take any other reasonable action necessary to preserve and protect the Collateral and Secured Party's rights and remedies under this Agreement. Debtor agrees that Secured Party shall have no duty or obligation whatsoever to take any of the foregoing actions. Should Debtor fail to take such actions at its own expense, after receipt of notice from the Secured Party, Debtor agrees to promptly reimburse Secured Party following written demand (including documentation reasonably supporting such request) for any payment made or any expense incurred by the Secured Party pursuant to this authorization. These payments and expenditures, together with interest thereon from date incurred until paid by Debtor at the maximum contract rate allowed under applicable laws, which Debtor agrees to pay, shall constitute additional Obligations and shall be secured by and entitled to the benefits of this Agreement. The Debtor agrees to reimburse the Secured Party on demand for any payment made, or any expense incurred by the Secured Party pursuant to the foregoing authorization, including attorneys' fees and expenses. Until an Event of Default, the Debtor may have possession of the Collateral and use it in any lawful manner not inconsistent with this Security Agreement and not inconsistent with any policy of insurance thereon.

**Section 6. Obligations Secured; Default; Certain Remedies**.

(a) This Security Agreement secures the Obligations to the Secured Party. Upon the occurrence of an Event of Default (as defined in the Note) with respect to the Debtor's Obligations under the Loan Documents (which shall be following the failure of Debtor and/or any Cure Party (as defined in the Note) to cure or correct an Event of Default within the sixty (60) day time frame set forth in Section 5 of the Note), the Secured Party shall have the remedies of a secured party under the Uniform Commercial Code in the State. The Secured Party may require the Debtor to assemble the Collateral and make it available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to both parties. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of reasonable notice shall be met if such notice is mailed to the Debtor via registered or certified mail, postage prepaid, at least fifteen (15) days before the time of sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like, shall include the Secured Party's reasonable attorneys' fees and legal expenses. For the avoidance of doubt,

an event shall not be considered an Event of Default (hereunder of under the Note) until Secured Party notifies the Board of Directors of Debtor of such default pursuant to Section 5 of the Note and Debtor and/or a Cure Party fails to correct or cure such default event within the sixty (60) day time period following such notice in accordance with Section 5 of the Note. In addition to any other remedies set forth herein, upon the occurrence of an Event of Default and after reasonable notice as set forth in this Section 6(a), Secured Party may accelerate all or any part of the Obligations and at any time thereafter exercise and/or enforce any of Secured Party's rights and remedies at Secured Party's option.

(b)     Upon the occurrence of an Event of Default and after reasonable notice as set forth in Section 6(a) above, Secured Party shall be entitled to immediate possession of all books and records evidencing any Collateral, and it or its representatives shall have the authority to enter upon any premises upon which any Collateral may be situated and remove the same therefrom without liability.  Debtor shall be entitled to any surplus, and Debtor shall be liable to Secured Party for any deficiency.

(c)     Upon the occurrence of an Event of Default and after reasonable notice as set forth in Section 6(a) above, Secured Party may foreclose on the Collateral or any part thereof by any method permitted by the Uniform Commercial Code and sell or otherwise dispose of and deliver the Collateral or any part thereof or interest therein at public or private sale or sales, at such prices and on such terms as may be commercially reasonable, with the right to the Secured Party or any purchaser to purchase the whole or any part of the Collateral free of any right or equity of redemption in Debtor, which right or equity is hereby expressly waived and released.

(d)     The Debtor hereby appoints the Secured Party as the Debtor's lawful attorney, with full power of substitution, in the name of the Debtor, for the sole use and benefit of the Secured Party, but at the Debtor's expense, to exercise, subject to the notice requirements set forth in paragraph (a) above, all or any of the following powers with respect to all or any of the Collateral from and after the occurrence and during the continuance of an Event of Default:

(i)     to demand, sue for, collect, receive and give a quittance for any and all monies due or to become due;

(ii)    to receive, take, endorse, assign and deliver all checks, notes, drafts, documents and other negotiable and non-negotiable instruments and chattel paper taken or received by the Secured Party;

(iii)   to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(iv)    to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference thereto;

(v)     to discharge any taxes, liens, security interests or other encumbrances at any time placed thereon; and

(vi)    to receive, open and forward the Debtor's mail.

**Section 7.  Debtor Remains Liable**.  Anything herein to the contrary notwithstanding:

(a) the Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein, and shall perform all of its duties and obligations under such contracts and agreements to the same extent as if this Security Agreement had not been executed;

(b) the exercise by the Secured Party of any of his rights hereunder shall not release the Debtor from any of its duties or obligations under any such contracts or agreements included in the Collateral; and

(c) the Secured Party shall not have any obligation or liability under any such contracts or agreements included in the Collateral by reason of this Security Agreement, nor shall the Secured Party be obligated to perform any of the obligations or duties of the Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder but shall cooperate in the release of any lien to the extent it is necessary for the Debtor to dispose of the Collateral in the operation of the business.

**Section 8. Security Interest Absolute**. All rights of the Secured Party and the security interests granted to the Secured Party hereunder shall be absolute and unconditional, irrespective of:

(a) any change in the time, manner or place of payment of, or in any other term of, all or any part of the Obligations or any other amendment to or waiver of or any consent to any departure from the Loan Documents;

(b) any exchange, release or non-perfection of any collateral (including the Collateral), or any release of or amendment to or waiver of or consent to or departure from any guaranty, for all or any of the Obligations; or

(c) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Debtor.

**Section 9. Additional Assurances**. At the request of the Secured Party, the Debtor will join in executing or will execute, as appropriate, all necessary financing statements and other documents reasonably necessary to secure the Secured Party's rights hereunder, in a form reasonably satisfactory to the Secured Party.

**Section 10. Expenses**. The Debtor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including the reasonable fees and disbursements of his counsel and of any experts and agents, which the Secured Party may incur in connection with: (a) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral; (b) the exercise or enforcement of any of the rights of the Secured Party hereunder; or (c) the failure by the Debtor to perform or observe any of the provisions hereof.

**Section 11. Covenants.**

(a) So long as the Obligations remain unpaid, Debtor shall: (i) keep the Collateral free of all liens, encumbrances and security interests, other than those of the Secured Party's and those of Adler's arising with respect to the Adler Note (as contemplated by the Subordination and Intercreditor Agreement of even date herewith by and among Debtor, Secured Party and Joshua Adler) or the EIDL (as contemplated by the Note); (ii) defend the Collateral against all claims and legal proceedings; (iii) pay and discharge when due all taxes, levies, fees and other charges upon the Collateral; (iv) not use or permit the Collateral to be used in violation of any applicable law or for personal, family or household purposes, nor in farming operations; (v) allow the Secured Party to inspect the Collateral and all books and records of Debtor pertaining to the Collateral (and make copies thereof) upon Secured Party's reasonable request; (vi) take any and all commercially reasonable actions necessary to defend title to the Collateral against all persons

and to defend the security interest of the Secured Party in the Collateral and the priority thereof against any lien not expressly permitted hereunder; (vii) not sell or offer to sell, assign, pledge, lease or otherwise transfer (whether directly or indirectly) the Collateral or any interest therein outside of the ordinary course of business, without the prior written consent of the Secured Party; and (viii) execute and deliver such additional documents and agreements as the Secured Party may request to protect the security interest granted herein and the priority of the Secured Party's interest in the Collateral.

(b)     Debtor shall use commercially reasonable efforts (taking into account the benefits and costs of any action to be taken) to maintain, service and repair the material Collateral so as to keep it in good operating condition (ordinary wear and tear, casualty and condemnation excepted). Debtor shall use commercially reasonable efforts (taking into account the benefits and costs of any action to be taken) to replace within a reasonable time all parts of material Collateral that may be worn out, lost, destroyed or otherwise rendered unfit for use, with appropriate replacement parts. Debtor shall obtain and maintain in good standing at all times all applicable material permits, licenses, registrations and certificates respecting the Collateral.

(c)     Debtor shall notify Secured Party in writing thirty (30) days prior to changing the name, identity, jurisdiction of incorporation or organization, place of business, chief executive office, or organizational structure of Debtor, and promptly upon any responsible officer learning of any charge, lien, security interest, claim or encumbrance asserted against the Collateral, any litigation against Debtor or the Collateral, any theft, loss, injury or similar incident involving the Collateral.

(d)     Debtor shall furnish to Secured Party, if requested, a landlord's waiver of all liens and an access agreement with respect to any Collateral covered by this Agreement that is or may be located upon leased premises, such landlord's waivers and access agreements to be in such form and upon such terms as are reasonably acceptable to Secured Party.

(e)     Debtor shall maintain in all material respects true, complete and accurate records of the Collateral and all products and proceeds thereof, and shall allow Secured Party, by or through any of its officers, agents, attorneys or accountants, to examine the Collateral upon Secured Party's request.

(f)     Debtor shall do, make, procure, execute and deliver such additional and further acts, things, deeds, interests and assurances as Secured Party may reasonably request from time to time to create, perfect or continue Secured Party's security interests and to protect, assure and enforce Secured Party's rights and remedies, duly noting Secured Party's security interest therein, if applicable. Debtor shall, at any time and from time to time, take such steps as Secured Party may reasonably request for Secured Party (i) to obtain an acknowledgment, in form and substance reasonably satisfactory to Secured Party, of any bailee having possession of any the Collateral, agreeing that such bailee holds possession of the Collateral for the benefit of Secured Party, (ii) to obtain "control," in any manner required by Secured Party, of any investment property, deposit account, letter of credit right, or electronic chattel paper (as such terms are defined in Article 9 of the UCC), pursuant to agreements establishing control in form and substance reasonably satisfactory to Secured Party, and (iii) otherwise to insure the continued perfection of Secured Party's security interests in any of the Collateral, and the preservation of Secured Party's rights therein.

**Section 12. <u>Miscellaneous</u>**.

(a)     <u>No Waivers</u>.  No waiver by the Secured Party of any default shall operate as a waiver of any other default or of the same default on any subsequent occasion.

(b) <u>Successors and Assigns</u>.  All rights of the Secured Party shall inure to the benefit of the successors and assigns of the Secured Party.  All obligations of the Debtor shall be binding upon the Debtor's successors and assigns.

(c) <u>Counterparts</u>.  This Security Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.  The delivery by a party of a PDF or facsimile signature to this Security Agreement shall have the same effect as the delivery of an original signature.

(d) <u>Remedies Cumulative</u>.  The rights and remedies herein are cumulative, and not exclusive of other rights and remedies which may be granted or provided by law.

(e) <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed effective when given in accordance with the Note.

(f) <u>Entire Agreement</u>.  This Security Agreement, the Note and the documents and instruments referred to herein embody the entire agreement entered into between the parties relating to the subject matter hereof, and may not be amended, waived, or discharged except by an instrument in writing executed by the party against whom enforcement of said amendment, waiver, or discharge is sought.

(g) <u>CHOICE OF LAW AND VENUE; SUBMISSION TO JURISDICTION; SERVICE OF PROCESS</u>.

   (i) THE VALIDITY OF THIS SECURITY AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF). THE PARTIES HERETO AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS SECURITY AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF HARRIS, STATE OF TEXAS.

   (ii) THE DEBTOR AND THE SECURED PARTY HEREBY SUBMIT FOR THEMSELVES AND IN RESPECT OF THEIR PROPERTY, GENERALLY AND UNCONDITIONALLY, TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

   (iii) NOTHING IN THIS SECURITY AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF THE SECURED PARTY OR THE DEBTOR TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY THE SECURED PARTY OR THE DEBTOR OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS SECURITY AGREEMENT TO ENFORCE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

(h) <u>WAIVER OF JURY TRIAL</u>. THE DEBTOR AND THE SECURED PARTY HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS SECURITY AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. THE DEBTOR AND THE SECURED PARTY REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES HIS OR ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF

**LITIGATION, A COPY OF THIS SECURITY AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

(i) <u>Legal Representation</u>.  Each party hereto hereby acknowledges and agrees that such party has had the opportunity to consult with and obtain the advice and counsel of an attorney of such party's own choosing.  In this regard, the Secured Party hereby further acknowledges, agrees and consents that the law firm of R. Reese & Associates, PLLC acts as legal counsel solely to the Debtor with respect to this Security Agreement, and that such firm does not act as legal counsel to the Secured Party with respect to this Security Agreement.

(j) <u>Construction</u>.  Any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Security Agreement. The parties hereto agree that the terms of this Security Agreement are the product of negotiation of the parties, and that this Security Agreement shall not be construed against any party by virtue of the fact that one party may have drafted this Security Agreement.

(k) <u>Assignment</u>.  Neither party hereto may assign or otherwise transfer this Security Agreement to another party without the prior written consent of the other party hereto.

(l) <u>Captions</u>.  The captions in this Security Agreement are inserted for convenience only and are not to be used to limit the terms herein.

(m) <u>Severability</u>.  In case any provision in or obligation under this Security Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first set forth above.

| DEBTOR: | SECURED PARTY: |
|---|---|
| SOURCEWATER, INC. | Energy Debt Holdings LLC |
| By: _/s/ Joshua Adler_____ | By:_____ |
| Name: Joshua Adler | Name: _____ |
| Its: CEO | Its: _____ |

*Signature Page to Security Agreement*

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement effective as of the date first set forth above.

| **DEBTOR:** | **SECURED PARTY:** |
|---|---|
| SOURCEWATER, INC. | Energy Debt Holdings LLC |

By: _____

By: _____/s/_____

Name: Joshua Adler

Name: Jay Whipple

Its: CEO

Its: Manager

*Signature Page to Security Agreement*